IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                          No. 13-20290-JTF-dkv

MICHAEL A. LILLEY,

    Defendant.

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION
TO SUPPRESS
_____

On July 31, 2014, the grand jury returned a fourteen-count superseding indictment charging the defendant, Michael A. Lilley ("Lilley"), with sex trafficking of minors in violation of 18 U.S.C. § 1591, conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594, sexual exploitation of minors in violation of 18 U.S.C. § 2251(a),(e), distribution of child pornography in violation of 2252(a)(2), and possession of child pornography in violation of § 2252(a)(4)(B). (Superseding Indictment, ECF No. 62.) These charges arise out of an investigation by the Federal Bureau of Investigation ("FBI"), Human Trafficking Division in Memphis, Tennessee, which led to the search of Lilley's home on a search warrant and his arrest on September 3, 2013.

Now before the court is Lilley's October 6, 2014 motion to suppress statements made after Lilley allegedly requested an attorney.[1] (Def.'s Mot. to Suppress, ECF No. 77.) The government filed a response on October 14, 2014. (Gov't's Resp., ECF No. 83.) The motion was referred to the United States Magistrate Judge for a report and recommendation. (ECF No. 87.) Pursuant to the reference, the court held an evidentiary hearing on November 5, 2014. At the hearing, the government called two witnesses, FBI Special Agent Stephen Lies ("Agent Lies") and FBI Special Agent Anthony Householder ("Agent Householder"), and introduced into evidence the "Advice of Rights" form signed by Lilley. Lilley called himself as a witness on his behalf.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following

---

[1]At the hearing, Lilley stated that he sought to suppress two statements: one statement made prior to the administration of his *Miranda* warnings, and one statement made after he was administered the *Miranda* warnings. The government stated at the hearing that it did not intend to use any statements made by Lilley prior to the administration of the *Miranda* warnings. The court therefore recommends that the motion to suppress statements made prior to the administration of Miranda warnings be denied as moot. Consequently, the only statement addressed in this Report and Recommendation is Lilley's statement he made after he was advised of his *Miranda* warnings in which he recognized the presence of minors in his back house.

findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## I. PROPOSED FINDINGS OF FACT

Agent Lies, who at the time was working as a special agent with the FBI Human Trafficking and Civil Rights Squad in Memphis, Tennessee, testified that he and other FBI agents arrived at Lilley's residence in Millington, Tennessee at 10:30 p.m. on September 3, 2013 to execute a search warrant. During the search, the FBI agents found people, including minors, in a back house located in Lilley's back yard. Agent Lies testified that he had witnessed Lilley leave the house a few minutes before the agents executed the search warrant and Agent Householder was directed to stop Lilley and bring him back to the house.

The government's second witness, Agent Householder, testified that he was in charge of pulling over and arresting Lilley. According to Agent Householder, once Lilley's van was stopped, Agent Householder told him that he was under arrest, handcuffed him, placed him in the passenger seat of Lilley's van, and told him that he was being taken to his house. Agent Householder then drove the van to Lilley's house. Agent Householder testified that he did not threaten Lilley.

Once Lilley was brought back to his house, Agent Lies searched Lilley's pockets for safety reasons and then returned

3

the items back to Lilley.  Agent Lies informed Lilley that they were conducting an investigation and escorted Lilley inside his residence.  Agent Lies and Lilley sat down in Lilley's kitchen, where Investigator Rojas was also present.  Agent Lies testified that he handed Lilley the Advice of Rights form and explained to Lilley that he was under no obligation to speak to the agents. The Advice of Rights form states the following:

> ADVICE OF RIGHTS — YOUR RIGHTS
>
> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
>
> I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

(Ex. 3.)

According to Agent Lies, he asked Lilley to read aloud the first two lines and Lilley read those aloud without difficulty. Agent Lies then read each sentence aloud to Lilley and had

Lilley initial each of the sentences as an indication that he understood that sentence. Agent Lies stated that he did not read the last sentence aloud — which contains the waiver provision — but he explained the substance of the sentence to Lilley and advised him to sign it if he wished to speak to the agents. According to Agent Lies, Lilley stated that he wanted to speak to the agents and signed the Advice of Rights form. Agent Lies testified, and the Advice of Rights form indicates, that the process of informing Lilley of his legal rights started at 11:10 p.m. and ended at 11:14 p.m. (*See* Ex. 3.) Lilley signed at the signature line, and Agent Lies and Investigator Rojas signed as witnesses. (*Id.*)

Agent Lies initially asked Lilley questions of a general nature. According to Agent Lies, at some point during this process, Lilley wanted to confirm that he did not have to answer any questions that he was not comfortable answering, and Agent Lies told Lilley that that was correct. According to Agent Lies, when Lilley was asked about his brother, Lilley stated without hesitation that he did not want to talk about him. Agent Lies asked Lilley if he knew some of the kids and Lilley acknowledged that he did know some of the kids. When Agent Lies started asking specific questions about the prostitution ring, Lilley asked for an attorney and the interrogation ceased. Agent Lies testified that Lilley was surprised, but clear,

5

coherent, and in control. The court found Agent Lies' testimony to be highly credible.

Lilley testified on his own behalf regarding his arrest and the subsequent interrogation. According to Lilley, he left his house around 10 or 11 p.m. on September 6, 2013 to pick up two people from his work. He was stopped by police cars at a stop sign soon after he left his residence. The police cars surrounded Lilley's van and the officers took him in custody, handcuffed him, and put him back in the van's passenger seat. According to Lilley, Agent Householder, who drove his van back to Lilley's residence, threatened him that if he moved he would ram his head in the windshield. Once they arrived at Lilley's residence, Agent Lies took him to the back of the van and took all his belongings out of his pocket. After examining them, Agent Lies put Lilley's belongings back in his pocket and escorted him to the kitchen for questioning.

According to Lilley, he asked for an attorney three times, but the interrogation only stopped after Lilley's third request. Lilley testified that when he first entered the kitchen he stated, "Don't you think I need an attorney? I think I need an attorney," to which Agent Lies did not respond. Then, Agent Lies presented Lilley with the Advice of Rights form and asked him to read it. Lilley told Agent Lies that he could not read the form because he was dyslexic. Agent Lies then read each

6

sentence aloud to Lilley, and Lilley initialed each sentence as Agent Lies read it. According to Lilley, he once again asked Agent Lies whether he needed an attorney after Agent Lies read the sentence stating that Lilley had a right to talk to a lawyer. Specifically, Lilley testified that he initialed that sentence but asked Agent Lies, "Don't you think I need an attorney?" According to Lilley, Agent Lies responded that they would discuss that when he was finished reading his Advice of Rights form.

Lilley testified that Agent Lies did not read aloud the last sentence in the Advice of Rights form and Lilley did not sign his initials next to this sentence. According to Lilley, Agent Lies told Lilley to sign the signature line to indicate that he was read the Advice of Right form. Lilley stated that he signed it because he was afraid that something bad would happen to him otherwise. Then Agent Lies started asking questions of a general nature to which Lilley responded. On cross-examination, Lilley stated that his memory about what was asked during the interrogation was not very good. When Agent Lies asked Lilley about the back house, Lilley requested an attorney. According to Lilley, at that point Agent Lies stopped asking questions but stated, "Are you sure? Kids talk. They are talking now," to which Lilley did not respond.

II. PROPOSED CONCLUSIONS OF LAW

7

In the present motion, Lilley seeks to suppress his statement affirming that he was aware of the presence of minors in his back house. Lilley alleges that this statement was made after he asked for an attorney upon being read his *Miranda* warnings. At the hearing, Lilley also argued that he was not read nor explained the last line in the Advice of Rights form, which embodies the waiver of his rights. Lilley also appeared to argue at the hearing that the statement in question was a result of police coercion.

In response, the government submits that Lilley was properly advised of his rights, he consented to the questioning for approximately thirty minutes, and the interrogation stopped when Lilley requested to speak with an attorney. The government maintains that the statement in question was made prior to Lilley's request for an attorney, it was voluntary, and it is admissible in court.

A. *Miranda* Warnings and Lilley's Waiver of His Rights

When police perform custodial interrogations, they must inform the persons in custody of four *Miranda* warnings: that they have the right to remain silent, that their statements can and will be used against them in court, that they have the right to an attorney, and that if they cannot afford an attorney, one can be appointed for them. *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966). If the defendant is not informed of these

8

rights, any pretrial statements obtained in a custodial interrogation are presumed coerced and inadmissible at trial in the government's cases in chief. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985). The "right" to *Miranda* warnings is not constitutionally mandated. *Michigan v. Tucker*, 417 U.S. 433, 444 (1974). Rather, the warnings are intended as a prophylactic mechanism to safeguard against the inherently coercive effects of custodial interrogation, which threatens the Fifth Amendment right against self-incrimination. *Id.*

After the *Miranda* warnings have been administered, the prosecution must also establish that the accused "'in fact knowingly and voluntarily waived *[Miranda]* rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)(quoting *North Carolina v. Butler,* 441 U.S. 369, 373 (1979)). Specifically, to waive the right to counsel the record must show "'that an accused was offered counsel but intelligently and understandingly rejected the offer.'" *Miranda*, 384 U.S. at 475 (quoting *Carnley v. Cochran*, 369 U.S. 506, 516 (1962)).

The prosecution "does not need to show that a waiver of *Miranda* rights was express . . . [and an] 'implicit waiver' . . . is sufficient to admit a suspect's statement into evidence." *Berghuis*, 560 U.S. at 384. A waiver of *Miranda* rights may be implied if the prosecution establishes that a *Miranda* warning

9

was given and the accused understood the *Miranda* rights. *Id.* Accordingly, if "the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* The Supreme Court further clarified its position by stating that "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385 (citing *Butler*, 441 U.S. at 372-76; *Colorado v. Connelly*, 479 U.S. 157, 169-170 (1986)).

The court finds that Lilley was properly informed of his *Miranda* warnings. The testimony is uncontroverted that Agent Lies read each of the *Miranda* warnings in the Advice of Rights form aloud to Lilley, and Lilley signed his initials next to each of the *Miranda* warnings that Agent Lies was required to communicate to him. Further, the court finds that Lilley understandingly and intelligently waived his privilege against self-incrimination and his right for an attorney. Lilley initialed the Advice of Rights form acknowledging that if he decided to answer questions without a lawyer, he had the right to stop answering at any time. Additionally, Agent Lies explained to Lilley that his signature on the Advice of Rights form would signify that he understood his rights and was willing

to answer questions without a lawyer present. Lilley's signature serves as an explicit waiver of his rights. The court is convinced that Lilley understood as much because thirty minutes into the interrogation he exercised his right to have an attorney present. Thus, there is an intelligent and competent waiver in this case as evidenced by Lilley's signature in the Advice of Rights form and the evidence at the hearing that Agent Lies explained to Lilley the waiver provision.

Even taking as true Lilley's testimony that Agent Lies did not explain the waiver provision to Lilley, the court finds that Lilley implicitly waived his rights because Lilley was informed of his rights and he understood them. *See Berghuis*, 560 U.S. at 384. There is no basis to conclude that Lilley did not understand his rights. Lilley received a written copy of the *Miranda* warnings, Agent Lies read them aloud to Lilley, and Lilley signed his initials next to each of the *Miranda* rights indicating that he understood them. The fact that Lilley understood clearly his rights is bolstered by the fact that he refused to answer questions about his brother, as well as by the fact that, after only thirty minutes of interrogation, Lilley exercised his right to have an attorney present. On these facts, it follows that Lilley "knew what he gave up when he spoke," thus, he implicitly waived his rights. *Berghuis*, 560 U.S. at 385.

B.  Voluntariness

At the hearing, Lilley challenged the voluntariness of his statement made subsequent to the administration of the *Miranda* warnings, by alleging that: (1) Agent Householder threatened Lilley while he was in the van; and (2) he signed the Advice of Rights form because he was afraid. If a defendant can show that "'coercive police activity' caused him to make an involuntary confession, due process prohibits the government from relying on the statement." *Jackson v. McKee*, 525 F.3d 430, 433 (6th Cir. 2008)(quoting *Connolly*, 479 U.S. at 167). Voluntariness is determined by examining "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000)(quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). This inquiry takes into account "'the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation.'" *Id.* (quoting *Schneckloth*, 412 U.S. at 226). Relevant factors in assessing the level of coercion are "age, education and intelligence of the suspect; whether the suspect was advised of his *Miranda* rights; the length of the questioning; and the use of physical punishment." *Jackson*, 525 F.3d at 433-34 (citing *Schneckloth*, 412 U.S. at 226). Similarly, "[a] waiver must be 'the product of a free and deliberate choice rather than intimidation,

coercion, or deception . . . .'" *Berghuis*, 560 U.S. at 371 (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)).

Considering all the relevant factors, the court finds that Lilley's statement was not a product of police coercion or intimidation. There is no evidence of any inherently coercive tactics, either from the nature of the police questioning or the environment in which it took place. Lilley was questioned in his kitchen, an environment that does not in the least suggest coerciveness. Regarding the length of the interrogation, the Supreme Court has stated that a lengthy interrogation "before a statement is made is strong evidence that the accused did not validly waive his rights." *Miranda*, 384 U.S. at 475. The total length of the interrogation in the present case was a mere thirty minutes, which further suggests a lack of coerciveness.

Moreover, it is undisputed from the testimony that Lilley was advised of his *Miranda* warnings, and that Lilley suffered no "physical punishment." *Jackson*, 525 F.3d at 433-34. Agent Lies testified that Lilley was clear, coherent, and in control. Lilley's responses were deliberate as evidenced by his refusal to answer any questions about his brother and by his eventual request to have an attorney present. There is no reason to believe, under circumstances such as are present here, that Lilley's responses to Agent Lies' questions were the result of illegitimate police coercion. *See id.* at 434-35 (listing a

number of cases that demonstrate "the kinds of involuntary-confession fact patterns that the Supreme Court has condemned"). Accordingly, the court finds that Lilley made the statement he is now attempting to suppress voluntarily, "in the unfettered exercise of his own will." *Miranda*, 384 U.S. at 460 (1966).

C. <u>Lilley's Invocation of His Fifth Amendment Right to Counsel</u>

Lilley argues that Agent Lies refused his first two requests for counsel and proceeded to interrogate him in violation of his Fifth Amendment right to counsel. If at any point the "individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474; *see also Edwards v. Arizona*, 451 U.S. 477, 484 (1981). The suspect's request for an attorney must be "sufficiently clear[] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994); *see also Berghuis*, 560 U.S. at 381. However, if a suspect makes an ambiguous, equivocal, or is "'indecisive in his request for counsel,'" the law enforcement officers need not cease interrogation. *Davis*, 512 U.S. at 459-60. In *Davis*, the Supreme Court found that the defendant's statement, "Maybe I should talk to a lawyer," was an ambiguous request for counsel. *Id.* at 462. Similarly, the Sixth Circuit has held that the statement that "[i]t would be nice" to have an attorney present

14

was an ambiguous request for counsel. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994). In a more recent case, the Sixth Circuit held that the defendant's statement, "I think I should talk to a lawyer, what do you think?" was an ambiguous request for counsel. *United States v. Delaney*, 443 F. App'x 122, 130 (2011).

Having already found Agent Lies' testimony credible, there were no *Miranda* violations in this case because Lilley's interrogation ceased when he invoked his right to counsel. Nevertheless, even accepting as true Lilley's testimony that he previously asked Agent Lies twice whether he should get an attorney, Lilley's remarks did not constitute an unequivocal and unambiguous request for an attorney. According to Lilley's testimony, his first remark to Agent Lies was, "Don't you think I need an attorney? I think I need an attorney," and his second remark to Agent Lies was, "Don't you think I need an attorney?" The Sixth Circuit has found similar statements to be ambiguous requests for counsel because neither statement "clearly indicate[s] that [Lilley] would only deal with the police with counsel present." *Delaney*, 443 F. App'x at 130 (holding that the defendant's remark, "I think I should talk to a lawyer, what do you think?" was not a request for counsel and therefore the agents were not required to stop questioning). Accordingly, the

15

court finds that Lilley's statement was not obtained in violation of his Fifth Amendment right to counsel.

### III. RECOMMENDATION

For the reasons expressed above, it is recommended that Lilley's motion to suppress be denied.

Respectfully submitted this 14th day of November, 2014.

                              s/Diane K. Vescovo
                              DIANE K. VESCOVO
                              UNITED STATES MAGISTRATE JUDGE

### NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.