IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                        No. 13-20290-JTF-dkv

MICHAEL A. LILLEY,

    Defendant.

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S SECOND MOTION
TO SUPPRESS

_____

On July 31, 2014, the grand jury returned a fourteen-count superseding indictment charging the defendant, Michael A. Lilley ("Lilley"), with sex trafficking of minors in violation of 18 U.S.C. § 1591, conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594, sexual exploitation of minors in violation of 18 U.S.C. § 2251(a),(e), distribution of child pornography in violation of 2252(a)(2), and possession of child pornography in violation of § 2252(a)(4)(B). (Superseding Indictment, ECF No. 62.)  These charges arise out of an investigation by the Federal Bureau of Investigation ("FBI"), Human Trafficking Division in Memphis, Tennessee, which led to the search of Lilley's home on a search warrant and his arrest on September 6, 2013.

On October 6, 2014, Lilley filed a motion to suppress statements made after Lilley allegedly requested an attorney. (ECF No. 77.)   The court held an evidentiary hearing on November 5, 2014.   At the hearing, the government called two witnesses, FBI Special Agent Stephen Lies ("Special Agent Lies") and FBI Special Agent Anthony Householder ("Special Agent Householder").   On November 14, 2014, the U.S. Magistrate Judge recommended that Lilley's motion to suppress be denied, (ECF No. 96), and the presiding U.S. District Judge adopted the recommendation and denied Lilley's motion to suppress, (ECF No. 104).

Now before the court is Lilley's June 15, 2015 second motion to suppress evidence recovered as a result of an allegedly unlawful arrest and search of his van.  (Def.'s Second Mot. to Suppress 1-2, ECF No. 168.)   Although not explicitly stated in his motion to suppress, Lilley's motion in essence seeks an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to suppress evidence recovered from the search of his residence based on the theory that Special Agent Lies omitted critical information about the reliability of one of the informants in his affidavit for the search warrant of Lilley's residence.[1]   The government filed a response on June 26, 2015.

---

[1]In his second motion to suppress, Lilley requests that the court reconsider its ruling on Lilley's first motion to suppress

(Gov't's Resp., ECF No. 173.)    The motion was referred to the

United States Magistrate Judge for a report and recommendation.

(Order of Reference, ECF No. 169.)

Pursuant to the reference, the court held an evidentiary

hearing on July 24, 2015.  At the hearing, the government called

three witnesses: (1) Special Agent Householder, (2) Special

Agent Lies, and (3) FBI Special Agent Jaime Corman ("Special

Agent Corman"), and introduced into evidence three exhibits: (1)

the application and affidavit for a search warrant for Lilley's

van dated September 10, 2013, (Ex. 4); (2) a list of items

---

based on newly discovered evidence that allegedly undermines the
testifying agents' credibility.  (Def.'s Second Mot. to Suppress
10-13, ECF No. 168.)    In a hearing held on July 23, 2015,
Lilley argued that the testifying agents' credibility was
undermined because: (1) Lilley's van was searched before the
agents secured a search warrant; (2) Lilley has been diagnosed
with dyslexia; (3) the agents strategically placed items in the
residence and then took photos of them; and (4) Special Agent
Lies's affidavit for the search warrant to Lilley's residence
did not include damaging information on one of the informants.
As to Lilley's first argument, the court found that the issue of
whether the van was searched before the agents secured a search
warrant was in dispute, and that, in any case, the agents did
not testify in the prior hearing on the subject of whether the
van was searched.  Therefore, the agents provided no false
testimony on the issue.  As to Lilley's second argument, the
court found that the issue of Lilley's dyslexia was actually
raised at the hearing on the first motion to suppress and Lilley
could have asked for an expert at that time but did not do so.
As to Lilley's third argument, the court found that it had no
relevance to the testifying agents' credibility because the
agents did not testify about the search of Lilley's residence at
the first hearing.  Lastly, the court determined that Lilley's
fourth argument was in fact a request for a *Franks* hearing,
which the court set for a hearing the next day, July 24, 2015,
to determine if a *Franks* hearing was warranted.

recovered from the September 11, 2013 search of Lilley's van, copied from a document created for the prosecution by Special Agent Lies (Ex. 6);[2] and (3) the evidence log including the items recovered from the search of Lilley's van on September 11, 2013 compiled by Special Agent Corman, (Ex. 7). Lilley did not call any witnesses but introduced into evidence five exhibits: (1) the United States appellate brief in *United States v. Fox*, 600 F. App'x 414 (6th Cir. 2015), (Ex. 1); (2) the search warrant for Lilley's residence, the application and the affidavit in support of the search warrant signed by Special Agent Lies, and the motion and subsequent order sealing the affidavit in support of the search warrant, (Ex. 2); (3) photographs of Lilley's van, (Ex. 3); (4) pages two and three of a FD-302 form[3] listing the evidence recovered from Lilley's residence following the September 6, 2013 search, (Ex. 5); and (5) a document indicating that on September 6, 2013, a cell phone was discovered on Lilley's van and retained for forensic and investigative purposes by Officer Cotton, (Ex. 8).

---

[2]This document does not indicate who performed the search of the van and it is not signed. Special Agent Lies testified that this document is not the official FBI report prepared after the search. The first item listed in this document is Lilley's cellphone. (*See* Ex. 6.)

[3]Special Agents Lies and Corman testified that a FD-302 form is form commonly used by the FBI to report investigation information.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## I.  PROPOSED FINDINGS OF FACT

The government's first witness, Special Agent Householder, has worked for the FBI for over three years.  Special Agent Householder became involved with the case on September 5, 2013, the night before Lilley's arrest and the search of his residence.  On September 6, 2013, Special Agent Householder arrived at the investigation's staging location at the Millington naval base a few hours before 10 p.m.  While en route to Lilley's residence in Millington, Tennessee around 10 p.m., Special Agent Householder was notified via radio that Lilley had left his residence and was instructed by the case agent to arrest Lilley.  Upon seeing Lilley's van stopped at a stop sign at the end of his street, Special Agent Householder turned the police lights on and stopped his vehicle in front of Lilley's van.  Another task officer, who had followed Lilley after he left his residence, stopped behind Lilley's van.  Special Agent Householder asked Lilley to step out of his van and told him that he was under arrest.  The other task officer present at the scene placed Lilley in handcuffs and searched him.  Upon

instructions from FBI Special Agent Janeen DiGuiseppi ("Special Agent DiGuiseppi"), who was serving as the supervisor over the entire squad, Special Agent Householder put Lilley in the passenger seat in Lilley's van and drove the van to Lilley's residence.

When asked why he drove the van back to Lilley's residence, Special Agent Householder responded that once Lilley was arrested, his van was parked illegally. While there was shoulder room on the street where Lilley was arrested, Special Agent Householder did not park the van on the street because Special Agent DiGuiseppi advised him to bring the van back to Lilley's house. On recross-examination, Special Agent Householder stated that he did not recall Lilley saying that his mother could pick up his van.

Special Agent Householder parked the van on the street in front of Lilley's residence and did not take anything out of the van. Upon arriving at Lilley's residence, another agent, possibly Special Agent Lies, escorted Lilley out of the van. Special Agent Householder testified that apart from advising Lilley that he was under arrest, he had no other interaction with Lilley that night. Special Agent Householder stepped out of the van and went to the backhouse, via the interior of Lilley's residence, to assist with the search of Lilley's residence. Special Agent Householder stated that there were

agents at the backhouse, but he did not recall seeing anyone else. At the backhouse, Special Agent Householder was asked to interview J.O. instead of assisting with the search. He interviewed J.O. in Agent Thompson's car. Eventually, J.O. was picked up by his mother.

As to the search of the van, Special Agent Householder stated that he does not recall whether the van doors were closed after he and Lilley left the van. Special Agent Householder testified that he did not search the van when he arrived at the residence nor did he look inside the console or under the seat. Further, Special Agent Householder stated that he does not recall seeing a phone in the van. Special Agent Householder stated that he was aware that the van was eventually searched, but he did not know who executed the search.

Special Agent Lies, who has worked as an agent with the FBI office in Memphis, Tennessee for sixteen years, served as the case agent in Lilley's investigation and was the affiant in the affidavit for the search of Lilley's residence. Special Agent Lies testified that surveillance of Lilley began at 6 p.m. on September 6, 2013. Special Agent Lies arrived at the designated surveillance site, located at a street close to Lilley's residence, at 5:45 p.m. Shortly thereafter, Special Agent Lies

watched Lilley leave the residence in his van.[4]  At some point, Special Agent Lies left the surveillance location to go to the Millington office.

Special Agent Lies returned to Lilley's residence between 10:30 p.m. and 10:45 p.m.  At that time, there were between ten and twenty officers at Lilley's residence.  After Special Agent Householder arrested Lilley and parked Lilley's van in front of Lilley's residence, Special Agent Lies searched Lilley and then moved him to the kitchen for questioning.  Special Agent Lies testified that he was in the kitchen with Lilley for approximately two to two-and-a-half hours.

As to the van, Special Agent Lies testified that prior to September 6, 2013, S.S., a seventeen-year-old girl, informed the agents that sexual acts took place in the van and that Lilley used the van to transport girls to the sexual encounters with clients.[5]  Upon Lilley's arrest, the FBI agents did not leave the van at the intersection because it was illegally parked and because the supervisor instructed Special Agent Householder to bring the van back to Lilley's residence.  The van was not taken to Memphis Police Department impound lot, but instead it was

---

[4]On cross-examination, Special Agent Lies stated that the agents did not arrest Lilley at that time because all the personnel had not made it to the residence yet.

[5]S.S.'s testimony regarding the van was in fact mentioned in the search warrant for the residence.  (*See* Aff. of Lies ¶ 9, Ex. 2.)

moved to the FBI office parking lot at 2 a.m. on the morning of September 7, 2013. According to Special Agent Lies, the purpose for the move was to secure the van so that it would not be stolen and would remain intact in anticipation of obtaining a search warrant for the van. Special Agent Lies further testified that the van was not searched that night, but that it was searched on September 11, 2013 pursuant to a search warrant.

On cross-examination, Special Agent Lies stated that on September 6, 2013, the agents took pictures of the van in order to memorialize the state it was in, (*See* Ex. 3). The pictures show a plugged-in black cell phone in the front seat and a camera in the backseat. (*Id.*) It is clear from the pictures that the doors of the van must have been at least partially open in order to take the photographs. (*Id.*)

As to Lilley's cell phone, Special Agent Lies testified that the agents saw a black smart phone plugged in the van. Special Agent Lies testified that S.S. and J.A., a seventeen-year-old boy who spent time at Lilley's backhouse, had informed the agents that Lilley used a black smart cell phone to take pictures of the girls to send to clients. Special Agent Lies testified that Task Force Officer Annette Cotton ("Officer Cotton"), who was the evidence custodian during the investigation, extracted the phone and placed it on airplane mode so that the phone could not be tampered remotely. Special

Agent Lies testified that he did not know if Officer Cotton kept the phone or put it back in the van. The search of the phone was conducted after the September 10, 2013 warrant was obtained.

Special Agent Lies also testified that the agents saw a camera in the van, which was not extracted because it did not appear that the camera was accessible remotely and therefore it could not be altered.

On cross-examination, Special Agent Lies was questioned about the young people that were in Lilley's backhouse. Special Agent Lies testified that while the agents were waiting for Special Agent Householder to bring Lilley back to the residence, no one came out of the backhouse. At some point after Lilley was brought to his kitchen, all the young people came out passing though the kitchen.[6] Some of the young people were placed in individual police vehicles for questioning, including J.O., who was interviewed in a police vehicle. At the end of the night, the minors were picked up by their parents.

The government's third witness, Special Agent Corman, has served as an agent in FBI's Human Trafficking squad for seven years. Special Agent Corman testified that on September 6,

_____

[6]Special Agent Lies stated that the kids must have walked from the backhouse through the kitchen because that was the only way out. However, Special Agent Lies testified that he did not specifically remember when the kids came out of the backhouse because there was a lot of activity going on and a lot of people were passing through.

2013, she was part of the surveillance team and later participated in the execution of the search warrant for Lilley's residence. Special Agent Corman testified that Lilley's phone was seized at 10:45 p.m. on September 6, 2013, the phone was placed on airplane mode, and the phone was secured as evidence by Officer Cotton, (*See* Ex. 8). Special Agent Corman testified that she participated in the search of the van on September 11, 2013 and wrote a report documenting the evidence found in the van, (Ex. 7). On cross-examination, Special Agent Corman testified that this report listed only items recovered on September 11, 2013, and that it did not include the phone because the phone was seized on September 6, 2013, (*See* Ex. 8).

Special Agent Corman testified that on September 6, 2013, she did not see anyone taking pictures of the van and does not remember the van doors being open. On September 11, 2013, FBI photographer Elizabeth Butcher took photos of the van.

## II.  PROPOSED CONCLUSIONS OF LAW

A.  <u>Entitlement to a *Franks* Hearing</u>

Lilley requests a *Franks* hearing based on his assertion that the agents omitted information on the search warrant for Lilley's residence that would undermine the credibility of S.S., one of the informants and an alleged victim of Lilley. Lilley argues that the government knew of S.S.'s unreliability because S.S. was involved in the investigation of Arnold Eugene Fox

("Fox"), which was conducted by the same FBI team.[7]  As support,

Lilley offered into evidence the United States appellate brief

in the *Fox* case, in which the government recognized that S.S.

lied to Fox numerous times in order to get money from him.

(Brief for United States 39-43, Ex. 1.)   Thus, Lilley argues,

this appeal brief is an admission by the government that S.S. is

not truthful, and such information should have been conveyed to

the issuing judge.[8]

The Supreme Court has held on numerous occasions that

hearings are impermissible when the defendant challenges the

sufficiency of the search warrant affidavits.   In *Aguillar v.*

---

[7]The investigation of Fox resulted in his conviction for
using a means of interstate commerce to attempt to persuade,
induce, entice, or coerce S.S. to engage in sexual activity with
him.  *See United States v. Fox*, 600 F. App'x 414, 415 (6th Cir.
2015).

[8]In *United States v. Fox*, Fox argued that the government
violated *Brady v. Maryland*, 373 U.S. 83 (1963) by withholding
information about S.S.'s involvement in Lilley's sex trafficking
case.  *Fox*, 600 F. App'x at 420.  Fox argued that "evidence that
S.S. took $1,700 from Lilley and then reported Lilley's
activities a few months later particularly damages her
credibility because it shows that S.S. engaged in a pattern of
'taking money from men, and then later running to the government
claiming sexual crimes had been committed against her.'"   *Id.*
Finding no *Brady* violation, the Sixth Circuit stated that S.S.'s
involvement in Lilley's case was "at most, marginally relevant
to Fox's defense," and had no relevance to "whether she told the
truth in Fox's case."  *Id.* at 421.  The Sixth Circuit further
stated that S.S. testified that on numerous occasions she lied
to Fox about why she needed money, and that "[i]n light of all
of that evidence tending to undermine S.S.'s credibility, any
further damage to her credibility from admitting that she either
took or stole $1,700 from Lilley would not have changed the
outcome of the case."  *Id.*

*Texas*, 378 U.S. 108, 109 (1968), the Court noted "[i]t is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's [the issuing judge's] attention." There is, however, an exception to this general rule created by *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that a court may have a hearing in which it considers evidence that was not before the issuing judge if the defendant can show that the affiant made a false statement or recklessly disregarded the truth in his affidavit. *Id.* at 155-56. However, before such a hearing, the defendant must first make a substantial preliminary showing that a false statement, which was necessary to the finding of probable cause, was knowingly or recklessly included by the affiant in the warrant affidavit. *Id.*; *United States v. Elkins*, 300 F.3d 638, 349-41 (6th Cir. 2002).

*Franks* also extends to circumstances in which an officer intentionally or recklessly omits evidence in a search-warrant affidavit that is critical to determining the existence of probable cause. *See United States v. Carpenter,* 360 F.3d 591, 596 (6th Cir. 2004)(en banc)("[T]his court has recognized that material omissions [from an affidavit] are not immune from inquiry under *Franks.*" (citation and internal quotation marks omitted)). "[A]n affidavit which omits potentially exculpatory

information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *Atkins*, 107 F.3d at 1217. Thus, in the case of an alleged omission from an affidavit, a *Franks* hearing will be justified only in "rare instances." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998).

"[T]o be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have *undermined* the showing of probable cause." *Id.* at 596–97; *see also United States v. Duval*, 742 F.3d 246, 250-51 (6th Cir. 2014)(citing *Carpenter*). Thus, under *Franks* the defendant is entitled to an evidentiary hearing on the veracity of the omissions in the affidavit if and only if (1) there is a substantial preliminary showing that the affiant omitted information deliberately or recklessly and (2) the affidavit, with the omitted material, undermines the showing of probable cause. *Carpenter*, 360 F.3d at 597; *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001); *United States v. Atkins*, 107 F.3d 1213, 1216-17 (6th Cir. 1997).

"An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Mays*, 134 F.3d at 815 (citing *United States v. Colkley,* 899 F.2d 297, 302 (4th Cir. 1990)). The focus is whether the affiant *himself* — and not the nongovernmental

informant — engaged in deliberate or reckless disregard for the truth in omitting critical information from the affidavit. *See Franks*, 438 U.S. at 171; *United States v. Hudson*, 325 F. App'x 423, 426 (6th Cir. 2009); *see also Rugendorf v. United States*, 376 U.S. 528, 532-33 (1964)(stating that erroneous statements in an affidavit that were not those of the affiant failed to show that the affiant acted in bad faith or that he made any misrepresentations in securing the warrant). While there is no clear list of what information the affiant must include in an affidavit, "the general idea is that the 'issuing judicial officer [must be] reasonably assured that the informant was credible and the information reliable.'" *United States v. Jones*, 533 F. App'x 562, 569 (6th Cir. 2013)(citing *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000)).

Courts draw a distinction between a confidential informant's tip and a victim's report. While an affidavit based on an informant's tip requires a showing of the informant's credibility, a victim's report automatically contains indicia of reliability. *See Rainer v. Lis*, No. 92-2436, 1994 WL 33969, at *3 (6th Cir. 1994). The Sixth Circuit has held that "statements of victims and eyewitnesses of crimes are entitled to a presumption of reliability and veracity without independent corroboration." *United States v. Ingram*, 985 F.2d 562 (6th Cir. 1993). An officer is entitled to rely on an eyewitness

identification to establish probable cause, "'unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)(citing *Rainer*, 1994 WL 33969, at *2); *see also United States v. Amerson*, 38 F.3d 1217, at *3 (6th Cir. 1994). Eyewitness statements are generally entitled to a presumption of reliability and veracity because they are based on firsthand observations. *Ahlers*, 188 F.3d at 370.

Lilley argues that because S.S. was involved in the investigation of Fox, which was led by the same FBI squad, Special Agent Lies must have known about her lies to Fox and thus he engaged in deliberate or reckless disregard in omitting such information from the affidavit. Lilley presented no further evidence as Agent Lies's knowledge of S.S.'s lies to Fox nor explicitly argued that the collective-knowledge doctrine applied, *see Duval*, 742 F.3d at 253. Nevertheless, because the same FBI division or unit was involved in both investigations, it is plausible that Agent Lies was aware of S.S.'s lies to Fox.

The analysis, however, does not stop there because Lilley must also show that the information omitted from the affidavit was critical to undermine S.S.'s credibility and if included in

the affidavit would undermine a showing of probable cause. The court finds the information omitted does not affect S.S.'s credibility and was not material to a finding of probable cause. S.S. was a victim of and an eyewitness to Lilley's prostitution ring, and, as such, her statements were entitled to a presumption of reliability. S.S.'s lies to Fox did not provide "an apparent reason for [Special Agent Lies] to believe that the eyewitness was lying." *See Ahlers*, 188 F.3d at 370. Given S.S.'s thorough details as to Lilley's prostitution activities, corroborated by those of J.A., Special Agent Lies did not have a reason to suspect that S.S. was a person of questionable veracity. S.S.'s lies to Fox are hardly a reason to doubt the reliability of the information given to the affiants and are not germane to the finding of probable cause. *See Fox*, 600 F. App'x at 421 (stating, in the context of a *Brady* violation, that S.S.'s involvement in the Lilley case had no relevance to "whether she told the truth in Fox's case"). In addition, S.S. originally reported Lilley's prostitution activities to her school crisis counselor, Barbara Martin at the Millington High School, instead of reporting the activities to law enforcement officers. This fact lends support to S.S.'s reliability.

On the contrary, had Special Agent Lies included the information as to S.S.'s previous involvement in the Fox investigation and subsequent trial, such information would boost

her credibility because it would show that S.S. had previously cooperated and been truthful with the agents providing reliable information to law enforcement in the Fox investigation. S.S. did not lie under oath and while under oath acknowledged her previous lies to Fox. Therefore, had Special Agent Lies included information about S.S.'s previous lies to Fox, such information would not serve to question her reliability as to the instant incident and it would not have undermined probable cause. Plus, S.S.'s "lies" involving Fox had occurred in 2011, two years earlier, when she was fifteen.

Further, in his affidavit for the search warrant of Lilley's residence, Special Agent Lies stated that he relied on the testimony of J.A., who had first-hand knowledge of Lilley's activities. (*See* Lies Aff. ¶¶ 7, 8, Ex. 2.) Lilley has not alleged that Agent Lies omitted information regarding the credibility of J.A. Eyewitness statements, such as those of J.A., are entitled to a presumption of reliability and veracity because they are based on firsthand observations. *Ahlers*, 188 F.3d at 370. Thus, even if the issuing judge had been unpersuaded by S.S.'s statements, she had sufficient grounds to find that probable cause existed to issue the search warrant based on J.A.'s statements.

In conclusion, Lilley has not made the necessary preliminary showing that Agent Lies intentionally or recklessly

misled the issuing judge by omitting critical information, the inclusion of which would undermine probable cause. Probable cause would exist despite the inclusion of the omitted information, and accordingly, a *Franks* hearing is not justified. *See United States v. Schumacher*, No. 14-3576, 2015 WL 3424796, at *2-3 (6th Cir. May 28, 2015); *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008).

B.    Probable Cause for Lilley's Arrest

Lilley argues that his arrest was unlawful because the agents did not have probable cause to arrest him. Lilley also argued at the hearing that there was no probable cause for Lilley's arrest because the arresting officer, Special Agent Householder, had no personal knowledge that Lilley had committed a crime.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." U.S. Const. amend. IV. "It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment." *Ingram v. City of Columbus,* 185 F.3d 579, 592-93 (6th Cir. 1999) (internal citation omitted). A warrantless arrest is reasonable when the officer has probable cause to believe the arrestee has committed a felony and the arrest occurs in a public place. *See*

*United States v. Watson*, 423 U.S. 411, 417-24 (1976); *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006)("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed."). To determine whether probable cause to arrest exists, the court "must examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)(quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The Supreme Court has stated that the probable cause standard is "'incapable of precise definition," but that "[t]he substance of all the definitions . . . is a reasonable ground for belief of guilt, . . . and that belief of guilt must be particularized with respect to the person to be searched or seized.'" *Id.* (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

Here, the FBI agents had probable cause to arrest Lilley based on the information provided to them by S.S. and J.A. As stated in detail in the affidavit for the search of Lilley's residence, S.S. and J.A. provided extensive information regarding Lilley's prostitution operations. (*See* Lies Aff., Ex. 2.) S.S. was one of the girls involved in Lilley's prostitution

ring and had first-hand knowledge of Lilley's operations. (*Id.* ¶ 9.) J.A. spent a lot of time at Lilley's backhouse, knew some of the girls involved in the prostitution scheme, and witnessed the meetings with the clients. (*Id.* ¶ 8.) The issuing judge found the information provided by S.S. and J.A. was sufficient to support probable cause for the search of Lilley's residence. Consequently, the court now also finds that the information provided by S.S. and J.A. sufficed to give the FBI agents probable cause to arrest Lilley.

At the hearing, Lilley also argued that there was no probable cause for Lilley's arrest because Special Agent Householder, the arresting officer, did not have personal knowledge of Lilley's criminal activity. However, this does not vitiate the existence of probable cause because "the collective knowledge of agents working as a team is to be considered together in determining probable cause." *United States v. Woods*, 544 F.2d 242, 259-60 (6th Cir. 1976); *see also Duval*, 742 F.3d at 253 (citing *Woods*). If agents work as a team, "the group's knowledge of a fact may be considered by a reviewing court, 'not just the knowledge of the individual officer who physically effected the arrest.'" *Duval*, 742 F.3d at 253 (citing *Woods*). "The collective-knowledge doctrine 'recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and

information transmitted by one officer to another.'" *Id.*
(citing *United States v. Lyons,* 687 F.3d 754, 766 (6th Cir.
2012)(applying the collective-knowledge doctrine when officers
conducting a *Terry* stop had "no independent basis to target" the
defendant, but rather were acting solely on another officer's
request)). Special Agent Householder was involved in the
operation on September 6, 2013 and he acted at the direction of
his supervisor to effect Lilley's arrest. Although Special
Agent Householder did not personally have first-hand knowledge
of the totality of the investigation, he could "act on
directions and information transmitted" by his supervisor. *See
Lyons*, 687 F.3d at 766.

C.    Probable Cause to Search Lilley's Van

Lilley argues that the photographs taken of the van on
September 6, 2013 and the extraction of Lilley's phone from the
van on the same date constitute a search of the van. Thus,
Lilley argues, because such search was not pursuant to a
warrant, it was unconstitutional. No argument was presented to
the contrary by the government, and the court accepts that
taking photographs of Lilley's van and removing Lilley's cell
phone from the van constituted a search of his van. Such
search, however, was constitutional because it was based upon
probable cause.

"Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)(quoting *United States v. Lumpkin,* 159 F.3d 983, 986 (6th Cir. 1998)). The Supreme Court has emphasized that this "exception has no separate exigency requirement." *Id.* (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)). The Sixth Circuit "has defined probable cause as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is said to exist when there is a fair *probability,* given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Howard,* 621 F.3d 433, 453 (6th Cir. 2010) (internal quotation marks omitted) (emphasis added).

The testifying agents' testimony and the search warrant for Lilley's residence indicate that the FBI agents had ample reasonable ground to believe that the van contained evidence of Lilley's prostitution activities. As stated above, S.S. and J.A. provided to the FBI agents detailed information regarding Lilley's prostitution ring. S.S. had conveyed to the FBI agents that Lilley used the van to transport the girls to the clients and that she engaged in sexual activities in Lilley's van. (*See* Lies Aff. ¶ 9, *See* Ex. 2.) S.S. had also conveyed to the FBI

agents that Lilley usually kept a camera in his van which he used to take pictures of the girls while they engaged in sex with the men. (*Id.*) Given the totality of the information known to the FBI agents, there was a fair probability that evidence of a crime would be found in the van and the FBI agents had probable cause to take possession of the van and perform a search of the entire van.[9]

Even assuming that the extraction of the phone and the taking of the photographs on September 6, 2013 constituted an unconstitutional search, the evidence sought to be suppressed would have inevitably been discovered. The inevitable discovery doctrine "allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995)(citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The "inevitable discovery exception applies when, at the time of the

---

[9]The government alternatively argues that the search of the van on September 6, 2013 was incident to Lilley's arrest and thus constitutional. (Gov't's Resp. 6-7, ECF No. 173.) Law enforcement officers are authorized "to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Arizona v. Gant*, 556 U.S. 332, at 343 (2009)(overruling the cases cited as support by the government, *New York v. Belton*, 453 U.S. 454 (1981) & *United States v. White*, 871 F.2d 41 (6th Cir. 1989)). Here, Lilley was no longer in the vehicle when the search of his van took place. Therefore, the search incident to an arrest exception is inapplicable to the instant search.

unlawful search, there was a separate independent line of investigation underway or there are compelling facts indicating that the disputed evidence would have inevitably been discovered, such as proof that the evidence would have been found in an inventory search that would inevitably follow seizure of a car." *Id.* at 498.

The record here is clear that at the time of the September 6, 2013 search, there was an independent line of investigation underway that would have led to the inevitable discovery of the items sought to be suppressed. As stated in the affidavit for the residence search warrant, the FBI agents began investigating Lilley on August 21, 2013 and were aware of the van's involvement in Lilley's illegal activities. (Lies Aff. ¶¶ 6, 9, Ex. 2.) In fact, Special Agent Lies specifically requested in the affidavit that the search warrant for the search of Lilley's residence "include any vehicles." (*Id.* at ¶ 18.) Pursuant to this ongoing investigation, the FBI agents sought and obtained a valid search warrant for Lilley's van on September 10, 2013, (Ex. 4), and lawfully searched the van on September 11, 2013. Therefore, the FBI agents would have inevitably found the evidence in Lilley's van.[10]

_____

[10]While it is plausible that the evidence would have also been discovered due to an inventory search of the vehicle, there was no testimony at the hearing as to the FBI's policy regarding impoundment of cars and inventory searches. Inventory searches

### III. RECOMMENDATION

For the reasons expressed above, it is recommended that Lilley's second motion to suppress be denied.

Respectfully submitted this 30th day of July, 2015.


s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE


### NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.

---

are an exception to the warrant requirement of the Fourth Amendment if conducted pursuant to police policy. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). It is unnecessary, however, to discuss the inventory exception because there is ample evidence that the FBI officers had probable cause to search the van on September 6, 2013, and that even if no probable cause had existed, the van would have been inevitably searched, as it was, pursuant to the September 10, 2013 warrant.